1

2

3

4

5

6

7

8

9              **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION**

11

12   MARY FRANCES RUELL,              )     Case No. CV 15-3666-AS
                                      )
13              Plaintiff,            )     **MEMORANDUM OPINION AND**
                                      )
14      v.                            )     **ORDER OF REMAND**
                                      )
15   CAROLYN W. COLVIN, Acting        )
     Commissioner of Social           )
16   Security,                        )
                                      )
17              Defendant.            )
     ─────────────────────────────   )
18

19        Pursuant to Sentence 4 of 42 U.S.C. § 405(g), IT IS HEREBY ORDERED

20   that this matter is remanded for further administrative action

21   consistent with this Opinion.

22

23                       **PROCEEDINGS**

24

25        On May 15, 2015, Plaintiff filed a Complaint seeking review of the

26   denial of her application for Disability Insurance Benefits. (Docket

27   Entry No. 1). The parties have consented to proceed before the

28   undersigned United States Magistrate Judge. (Docket Entry Nos. 10-11).
     On September 14, 2015, Defendant filed an Answer along with the
     Administrative Record ("AR"). (Docket Entry Nos. 13-14). The parties

filed a Joint Position Statement ("Joint Stip.") on December 1, 2015, setting forth their respective positions regarding Plaintiff's claims. (Docket Entry No. 15).

The Court has taken this matter under submission without oral argument. See C.D. Cal. L.R. 7-15; "Order Re: Procedures In Social Security Case," filed May 18, 2015 (Docket Entry No. 7).

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On February 14, 2012, Plaintiff, formerly employed as a an insurance underwriter (see AR 39, 121), filed an application for Disability Insurance Benefits, alleging a disability since March 1, 2002. (See AR 103-06).

On May 8, 2013, the Administrative Law Judge ("ALJ"), John Wojciechowski, heard testimony from Plaintiff, who was not represented by counsel, Plaintiff's husband Tim Reilly (see AR 142), and vocational expert Gail Maron. (See AR 30-69). On July 22, 2013, the ALJ issued a decision denying Plaintiff's application. (See AR 19-24). After finding that Plaintiff had a severe impairment -- bilateral hip degenerative joint disease[1] (AR 21) --, the ALJ found that Plaintiff had the following residual functional capacity[2] ("RFC"): lifting and carrying 50 pounds occasionally and 25 pounds frequently; sitting 6 hours in an 8-hour workday; standing and walking 2 hours in an 8-hour workday; occasionally climbing, bending, stooping, kneeling, crouching and crawling; and no concentrated exposure to pulmonary irritants such as gasses, fumes and odors. (AR 22-23). The ALJ found that Plaintiff could

---

[1]   The ALJ found that Plaintiff's bilateral carpal tunnel syndrome, lumbar degenerative disc disease, cervical degenerative disc disease and osteoarthritis were non-severe impairments. (See AR 21).

[2]   A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1).

perform her past relevant work as an insurance underwriter (AR 23-24), and therefore found that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 24).

Plaintiff requested that the Appeals Council review the ALJ's Decision. (See AR 15, 155-57). The request was denied on May 21, 2014. (See AR 1-6). The ALJ's Decision then became the final decision of the Commissioner, allowing this Court to review the decision. See 42 U.S.C. §§ 405(g), 1383(c).

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ erred in failing to: (1) fully and fairly develop the record; (2) properly evaluate Plaintiff's severe impairments; (3) properly evaluate Plaintiff's credibility; and (4) properly determine Plaintiff's RFC. (See Joint Stip. at 2-8, 11-19, 21-24, 26).

**DISCUSSION**

After consideration of the record as a whole, the Court finds that Plaintiff's third claim of error warrants a remand for further consideration. Since the Court is remanding the matter based on Plaintiff's third claim of error, the Court will not address Plaintiff's first, second and fourth claims of error.

**A.    The ALJ Failed to Properly Assess Plaintiff's Credibility**

Plaintiff asserts that the ALJ failed to provide legitimate reasons for finding Plaintiff not credible. (See Joint Stip. at 16-19, 21-22). Defendant asserts that the ALJ properly found Plaintiff not fully credible. (See Joint Stip. at 19-21).

3

Plaintiff made the following statements in an undated Disability Report - Adult: Back pain, avascular necrosis on both hips, fibromyalgia, torn meniscus, carpal tunnel and radiculopathy limit her ability to work.  (See AR 120).

Plaintiff made the following statements in a Function Report - Adult dated April 30, 2012:

(1) she lives in a house with family; (2) she is unable to sit, stand or walk for an extended length of time due to pain in her hips, back and knees; (3) on a daily basis, she has breakfast, ices her hips and back, takes her prescription medications, uses her TENS unit, has lunch, ices her hips, back and knees, has dinner, ices her hips, back and knees, showers, and goes to bed; (4) she does not take care of her husband and son ("We all take care of each other") or pets ("My husband and son feed and care for them"); (5) as a result of her conditions, she can no longer work, exercise, roller skate, power walk, or take care of her grandchildren; (6) her conditions affect her ability to sleep; she cannot sleep more than 2 to 3 hours without ice packs; (7) she has no problem with her personal care, and she does not need help or reminders taking medicine; (8) she can prepare her own meals (i.e., a bowl of cereal, fruit, or a sandwich) but her husband does most of the cooking on a daily basis (which was not the case before her conditions); the frequency she prepares food or meals depends on her pain level; (9) she makes her bed and tidies up her son's room on a daily basis (10 minutes); after changing the bed sheets (for which she needs help), she has to ice her back; (10) she does not do house or yard work because of her back, hip and knees; (11) she does not go outside in the cold unless she has to, but goes out more often when the weather is warmer; she drives a car (she can go out alone) or

4

rides in a car; (12) she shops in stores, by phone, by mail and by computer; she buys clothes for herself and her husband does the grocery shopping (she goes shopping for groceries a couple of times a year, which takes 1 hour to 1 1/2 hours); (13) she is able to pay bills, count change, handle a savings account, and use a checkbook/money orders; (14) her hobbies and interests are reading, gardening, going to professional baseball games, watching television, roller skating and power walking; she can still read and watch television, but as a result of her conditions is limited in her ability to roller skate, garden, and go to baseball games and power walk; (15) she spends time talking on the phone with others or going to her neighbors' houses or son's house for a short period of time (a couple times a week, depending on her pain); she regularly goes to the doctors or to the church (if she had a good night and can tolerate sitting in the pews for an hour); she does not have any problems getting along with others; she no longer is able to attend church regularly and is unable to go her son's football games or drive to her family members who live out of the state; (16) her conditions affect her abilities to lift (no more than a gallon of milk), squat (hurts her knees and hips), bend (hurts her back and knees), stand (hurts her back and knees), walk, sit, kneel, and stair climb (all hurt her back, hips and knees), and use her hands; (17) she can walk around the block before she needs to stop and rest; she can resume walking after a few minutes (but needs to apply ice later); (18) she can finish what she starts, she follows written and spoken instructions very well, she gets along with authority figures very well, she handles stress fine, she handles changes in routine without any problem, and she does not have any unusual behavior or fears; and (19) she uses a walker, brace/splint, and glasses/contact lenses for reading (all were prescribed in February 2012).

(See AR 132-39).

Plaintiff made the following statements in an undated Disability Report – Appeal:

> She has experienced some changes since her last disability report (April 18, 2012). She puts on ice every 1 to 2 hours 24 hours a day (previously, she had put on ice at peak times during the day and once before bed). When she goes out for more than 1 to 2 hours, it takes her a couple of days to normalize. Her back, avascular necrosis, fibromyalgia, hips and carpal tunnel have gotten worse. Her level of pain has increased. As far as her day is concerned, she wakes up early (4:00 to 5:00 a.m.), takes her medication, puts on an ice pack, eats cereal (she cannot stand long enough to prepare a meal), she replaces her ice pack every 1 1/2 to 2 hours, she has lunch (fruit or a sandwich, if she can), she puts on another ice pack, her husband prepares dinner and cleans up, she continues to put on ice packs, and she goes to sleep around 1:00 to 2:00 a.m. She has missed several family functions because of her pain. If she does attend a function, she needs several days to recover. She cannot attend her son's football games because she cannot sit, and she cannot attend church because of the hard pews. (See AR 142, 146, 150).

At the May 8, 2013 hearing, Plaintiff testified to the following:

> She is 51 years old. She lives in a house with her husband (who works) and her adult son (who takes care of her during the day, and will be going to school). She completed 10th grade in high school, She has a California Driver's License, but she does not drive regularly because of her

medication.   She last worked as an insurance underwriter in 2001, but she stopped that work because she had hurt herself (she was not physically able to do it because of her back and hips).   She has not worked since March 1, 2002 (her alleged disability date).   (See AR 35-39).

Her doctor believes she suffers back pain because of her hips.   (Her neurologist told her to not let them operate on her back.).   She has necrosis in her hips and her knees.   Her hip pain caused her to suffer shooting pains in her groin when she walked.   For 10 years she went from doctor to doctor trying to find a solution, other than medications.   When she first stopped working she tried physical therapy for her back, hips and hands (which did not work).   She then tried riding a bike (which hurt her knees).   She uses a TENS unit, does limited home exercises, and uses ice packs 24 hours a day. She has used a cane off and on since 2002 to help her walk short distances.   (See AR 43, 47-49, 56, 58-60).

A couple of years ago (approximately 2010) a radio frequency neurotomy, which deadened the nerves, was done on her knees; it helped a little.   (See AR 49-50).   Prior to then, she had not had any orthopedic surgery.   She cannot have surgery for her hips or knees because she is allergic to nickel ("So, I don't know if I can tolerate a hip replacement or knee replacements.").   She has not had any arthoscopic procedures.   (See AR 49-51, 57-58).

She had a lifting accident at work.   She had several falls at home, one of which resulted in a torn meniscus (she was told to rest in bed for 6 months).   (See AR 51).

She has had bilateral carpal tunnel syndrome since 2002. She has not ever had surgical release because it would result in her wearing a cast, making it difficult for her to use the toilet.  She wears braces for it (but not since 2002).  (See AR 57-58).

She has fibromyalgia.  A few months ago she was being treated with Lyrica, but she cannot take it.  (See AR 54).

She takes Oxycodone for pain.  Prior to that, she took Soma, Temazepam, Ambien, and Naproxyn.  (See AR 53-54).

She has a mitral valve prolapse, but she never has had a valve replacement.  She also has had asthma since she was a child.  She uses a rescue inhaler (Advair) daily.  She has not had to go to the emergency room for her asthma in about 15 years because of her nebulizer at home.  (See AR 51-53).

Since 2001, she has not been able to cook, clean, do housework, and shop.  She also has not been able to walk, roller skate, play ball, go out with her grandchildren and her son, and attend games and weddings.  (See AR 55-56).

The ALJ briefly summarized Plaintiff's testimony as follows:

The claimant alleges that she was disabled on, or prior to, her date last insured [December 31, 2006] due to pain and limitations.  She alleges that she could not have performed any work activity on a sustained basis for 8 hours a day, 5 days a week, or an equivalent basis, due to her back, knee and hip pain.  At the hearing, she described her medical history and her search for answers to her medical problems from her

alleged onset date through the present. (AR 22, bracketed date last insured added).

The ALJ then stated:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In making my determination of the claimant's residual functional capacity, I have considered the claimant's allegations of disabling limitations pursuant to the law of the Ninth Circuit Court of Appeals, Social Security Rulings 96-3p and 96-7p and the pertinent regulations. For the following clear and convincing reasons, I find the claimant's allegations of disabling limitations are not credible to the extent alleged for the period on or prior to her date last insured, even though her records show that her impairments now are very severe. [¶] The claimant was not taking the type of pain medication associated with severe, disabling pain. [¶] Records dated September 6, 2002 state that the claimant's x-rays showed osteoarthritis in her knee and mild degenerative disc disease at L5-6 (S1) and L4-5 (Exhibit 6F/1). [¶] The claimant's November 5, 2002 MRI of the lumbar spine shows that there was no evidence of disc herniation or neural impingement and that there was only mild facet anthropathy at L3-4 and L4-5 (Exhibit 7F/3). [¶] On January 2, 2005, the claimant's nerve conduction test showed bilateral carpal tunnel syndrome (Exhibit 6F/2). There was no report of surgery. [¶] On March

9

29, 2006, the claimant reported improvement with her pain levels in all areas including decreasing overall at L5 with her physical therapy (Exhibit 5F/352). [¶] On November 15, 2006, the claimant's EMG of the upper extremities was found to be normal (Exhibit 5F/348, 343, 344). [¶] The claimant's MRI of her lumbar spine, dated, October 4, 2006, just about three months prior to her date last insured, was normal.  On August 11, 2007, eight months after her date last insured, she was noted to have mild narrowing of the right neural foramen without obvious nerve root displacement at L2-3 (Exhibit 11F/4). [¶] The claimant's MRI of April 10, 2007, four months after her date last insure (sic), shows right hip stage I/II avascular neurosis.  On June 6, 2007, six months after her date last insured, her x-ray showed early degenerative arthritic changes in her right hip.  It is not until September 14, 2007 that avascular necrosis of the right hip was diagnosed.  But, even on that date, Dr. Willen wrote that the claimant was almost asymptomatic at her right hip, and that she did not need any further antibiotic therapy.  In fact, he thought that she might have bursitis (Exhibit 5F/339).  And, on November 8, 2007, ten months after her date last insured, Dr. Katz stated that there was no indication of surgery needed.  She was treated conservatively with exercises, possible physical therapy, and aspirin (Exhibit 5/337).  It was not until a year after her date last insured, on December 3, 2007, that her x-ray shows a stage III/IV radiographic sing of avascular necrosis of the right hip joint and a stage II of the left femoral head (Exhibits 9F/1-2, 11F/2, 5F/341). [¶] Consequently, the claimant's allegations of disabling limitations are not credible to the extent alleged.

(AR 22-23).

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281 (9th Cir. 1996); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 1991).  Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his pain and symptoms only by articulating specific, clear and convincing reasons for doing so.  <u>Brown-Hunter v. Colvin</u>, 798 F.3d 749, 755 (9th Cir. 2015)(citing <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1036 (9th Cir. 2007)); <u>see also</u> <u>Smolen v. Chater</u>, <u>supra</u>; <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998); <u>Light v. Social Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997). Because the ALJ does not cite to any evidence in the record of malingering, the "clear and convincing" standard stated above applies.

Here, the ALJ failed to provide clear and convincing reasons for his finding that Plaintiff's testimony about the intensity, persistence and limiting effects of the symptoms was not fully credible.[3]

First, the ALJ failed to "specifically identify 'what testimony is not credible and what evidence undermines [Plaintiff's] complaints.'" <u>Parra v. Astrue</u>, 481 F.3d 742, 750 (9th Cir. 2007) (quoting <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995)); <u>see also</u> <u>Smolen v. Chater</u>, <u>supra</u>, 80 F.3d at 1284 ("The ALJ must state specifically what symptom testimony is not credible and what facts in the record lead to that conclusion").

Second, the ALJ's discrediting of Plaintiff's testimony because she

---

[3]    The Court will not consider reasons for finding Plaintiff not fully credible (<u>see</u> Joint Stip. at 20) that were not given by the ALJ in the Decision.   <u>See</u> <u>Pinto v. Massanari</u>, 249 F.3d 840, 847-48 (9th Cir. 2001); <u>SEC v. Chenery Corp.</u>, 332 US 194, 196 (1947).

"was not taking the type of pain medication associated with severe, disabling pain" was improper. There are numerous medical records reflecting that Plaintiff took medication for her pain between her disability onset date (March 1, 2002) and her date last insured (December 31, 2006). (See AR 477 [illegible date 2002, Soma, Vicodin], 473 [illegible date 2002, Soma, Vicodin], 472 [October 14, 2002, Soma, Vicodin], 470 [March 7, 2003, Soma, Vicodin], 464 [June 6, 2003, Soma, Vicodin, Neurontin], 463 [August 8, 2003, Soma, Vicodin, Neurontin], 462 [November 10, 2003, Vicodin], 458 [March 9, 2004, Vicodin], 453 [March 24, 2004, Vicodin], 452 [May 19, 2004, Vicodin], 444 [October 25, 2004, Soma, Flexeril, Vicodin], 441 [November 23, 2004, Soma, Flexeril, Vicodin], 438 [March 15, 2005, Soma, Flexeril, Vicodin], 436 [May 5, 2005, Soma, Flexeril, Vicodin], 424 [June 8, 2005, Soma, Flexeril, Vicodin], 423 [September 12, 2005 [Soma, Flexeril, Vicodin], 422 [January 12, 2006 [Soma, Flexeril, Vicadin], 414 [April 27, 2006, Soma, Flexeril, Vicodin], and 415 [July 27, 2006, Soma, Flexeril, Vicodin]. Moreover, the ALJ fails to specify what types of pain medication would be associated with severe, disabling pain.[4]

Second, to the extent that the ALJ discounted Plaintiff's testimony concerning her symptoms and limitations related to her bilateral carpal tunnel syndrome because "[t]here was no report of surgery", the ALJ's reason was improper. Plaintiff did not testify that she had surgery for her carpal tunnel. Indeed, the absence of a report of surgery was consistent with Plaintiff's testimony that she had not had surgery for

---

[4]    Defendant contends that the ALJ's error, if any, in discrediting Plaintiff's testimony based on the types of pain medications taken was harmless in light of the other valid reasons given for discrediting Plaintiff's testimony. (See Joint Stip. at 21 n. 12). However, since, as discussed above and below, none of the reasons given by the ALJ for discrediting Plaintiff's testimony was specific and legitimate, the Court is unable to find that the ALJ's error was harmless. See Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'"); Burch v. Barnhart, 40 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").

her carpal tunnel because such surgery would make it difficult for her to use the toilet (see AR 56-57). Moreover, at the hearing, the ALJ did not ask Plaintiff which of her doctors had recommended carpal tunnel release surgery or why there may not have been any notations in the record about that recommended surgery.

Third, the ALJ's discrediting of Plaintiff's testimony based on the conservative course of treatment (i.e., "exercises, possible physical therapy, and aspirin") and on her doctor's statement (approximately two months after Plaintiff was diagnosed with avascular necrosis of the right hip [September 14, 2007] and approximately seven months after an MRI showed stage 1/II avascular neurosis of the right hip [April 10, 2007], both of which occurred after the date last insured) "that there was no indication of surgery needed" for the avascular necrosis of the right hip was improper. Evidence of conservative treatment may be considered in a credibility determination. Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment[.]"). However, the ALJ has failed to show that exercises, physical therapy and aspirin was a conservative course of treatment for avascular necrosis of the right hip. See Childress v. Colvin, 2014 WL 4629593, *12 (N.D. Cal. Sept. 16, 2014) ("There is no guiding authority on what exactly constitutes 'conservative' or 'routine' treatment."); Boitnott v. Colvin, 2016 WL 362348, *4 (S.D. Cal. January 29, 2016) (explaining that "[t]here was no medical testimony at the hearing or documentation in the medical record that the prescribed medication constituted 'conservative' treatment of [the plaintiff's] conditions," and that the ALJ "was not qualified to draw his own inference regarding whether more aggressive courses of treatments were available for Plaintiff's conditions"). Contrary to the ALJ's assertion, Plaintiff's doctor did not state that "there was no indication of surgery needed"; rather, Plaintiff's doctor stated only that there was "no indication for surgery now." (AR 593). Moreover, at the hearing, the ALJ did not ask

Plaintiff about why her treatment for the avascular necrosis of the right hip was conservative or why surgery was not being recommended by her doctor at that time.  Finally, the ALJ's "conservative treatment" credibility determination solely concerned Plaintiff's testimony concerning her right hip; it did not relate to Plaintiff's testimony concerning her left hip (see AR 21 [the ALJ found that bilateral hip degenerative joint disease was a severe impairment]).

Fourth, although the ALJ also found that there was a lack of objective medical evidence supporting Plaintiff's testimony concerning her symptoms and limitations, the lack of supporting objective medical evidence cannot, by itself, support an adverse credibility finding.  See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998).

**B.   Remand Is Warranted**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  Id. at 1179 ("[T]he decision of whether to remand for further proceedings turns upon the likely utility of such proceedings.").  However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate.  McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011); Harman v. Apfel, supra, 211 F.3d at 1179-81.

Since the ALJ failed to properly assess Plaintiff's credibility, remand is appropriate.  Because outstanding issues must be resolved before a determination of disability can be made, and "when the record

14

as a whole creates serious doubt as to whether the [Plaintiff] is, in fact, disabled within the meaning of the Social Security Act," further administrative proceedings would serve a useful purpose and remedy defects. <u>Burrell v. Colvin</u>, 775 F.3d 1133, 1141 (9th Cir. 2014)(citations omitted).[5]

**ORDER**

For the foregoing reasons, the decision of the Commissioner is reversed, and the matter is remanded for further proceedings pursuant to Sentence 4 of 42 U.S.C. § 405(g).

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: March 8, 2016.

/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

---

[5]     The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time. "[E]valuation of the record as a whole creates serious doubt that Plaintiff is in fact disabled." <u>See</u> <u>Garrison v. Colvin</u>, 759 F.3d 995, 1021 (2014). Accordingly, the Court declines to rule on Plaintiff's claims regarding the ALJ's alleged failure to fully and fairly develop the record (<u>see</u> Joint Stip. at 2-8, 11-12), properly evaluate Plaintiff's severe impairments (<u>see</u> Joint Stip. at 12-16), and properly determine Plaintiff's RFC (<u>see</u> Joint Stip. at 22-24, 26). Because this matter is being remanded for further consideration, these issues should also be considered on remand.